CRAIN, Judge.
Joseph Delatte was indicted for theft of livestock, a violation of La.R.S. 14:67.1. He was tried by a jury, which convicted him as charged. Subsequently, defendant was sentenced to serve an eight and one-half year term of imprisonment at hard labor. Defendant has appealed, urging eleven assignments of error. Assignments of error three, four, five and eight were not briefed on appeal and are, therefore, considered abandoned. Uniform Rules — Courts of Appeal, Rule 2-12.4.
FACTS
On or about July 24, 1985, three horses were stolen from Dr. Charles Issel’s farm in West Feliciana Parish. At the time of the offense, Dr. Issel, a veterinary virologist at LSU, was in New Mexico and no one was directly attending his farm.
On the date in question, John M. Thompson, an adjoining property owner, noticed that the gate to a lot located behind Dr. Issel’s farm house was open and that three horses were standing in the yard behind the house. Thompson was aware that Dr. Issel kept six horses in the lot. He also noticed that someone had apparently gained entry to Dr. Issel’s tack room.
Thompson promptly telephoned Laurie Issel, Dr. Issel’s daughter, informing her of his discovery. Ms. Issel went to the farm and confirmed that three horses were missing, as well as a saddle and some animal feed. When Dr. Issel returned from New Mexico on July 26, 1985, he went to the farm and verified the particular horses that were missing. The horses had last been seen by Dr. Issel and Ms. Issel on the weekend preceding the date in question, a Wednesday.
Dr. Issel testified that defendant had been to his farm several times on unannounced visits. He had last seen defendant at the farm on the preceding July 7. On that occasion, he and defendant had discussed possible best places to sell horses. Defendant had informed him that one of the best markets was an auction in Tyler-town, Mississippi.
On July 27, Dr. Issel went to Tylertown where he met West Feliciana Parish deputy sheriffs Ivy Cutrer and Randall Keith Holden at the Livestock Producers Auction sale barn. Dr. Issel and the deputies walked through the barns in the back of the auction sale barn, looking for the stolen horses. At about 3:30 p.m., defendant’s dual rear wheel pickup truck and livestock trailer, with three horses inside, was found parked in the parking lot. Dr. Issel identified the three horses inside defendant’s trailer as those stolen from him.
At about 4:00 p.m., local deputy sheriff David M. Graves of Walthall County came to the auction sale barn to assist in the investigation. Graves and Cutrer maintained a surveillance of defendant’s truck and trailer, while Holden undertook a surveillance of defendant inside the auction sale barn. Defendant was observed numerous times in close proximity to his truck. Later, after 10:00 p.m., the horses were removed from defendant’s trailer by defendant and Johnny Ogden, who had accompanied defendant to the auction, and sold at the auction sale.
*902 Johnny Ogden testified that, on the day of the auction sale, defendant came to his house to pick him up since he had agreed to attend the sale with defendant. Defendant had three horses in the trailer at the time. During the course of their trip to Tyler-town, defendant told Ogden he had bought the horses at a sale in Carenero, Louisiana. Defendant, however, never claimed he owned the horses. Ogden testified that he had horses of his own but denied that the stolen horses were ever on his property.
T.J. Fitzhugh, Ogden’s brother-in-law and next door neighbor, testified that on the day of the auction sale at around 2:00 p.m., he saw defendant’s truck and trailer in front of Johnny Ogden’s house with three horses inside the trailer. He testified that he did not see the horses being loaded into the trailer from Ogden’s property.
Harvey Holmes, an employee of the auction sale barn, testified that he made out a check-in ticket on the stolen horses which were brought in by defendant. Defendant gave Holmes the name “Robert Burns”, which Holmes entered on the check-in ticket. He affixed consecutively numbered identification tags to the three horses and entered the numbers on the check-in ticket.
After the horses were sold at the auction sale barn, employees of the sale barn prepared a check payable to “Robert Burns”. Defendant came by the auction sale office to get the check, and Henrietta Stringer, an office employee, gave it to him. Later, defendant asked Stringer if she would cash the check. She replied in the affirmative. Defendant endorsed the reverse side of the check, first signing the name “Robert Bums” and then his own name below the first endorsement. He was then given the money for the check.
Deputy Cutrer testified that, following defendant’s arrest on the day of the auction sale, he had a “very limited” conversation with defendant after first advising him of his constitutional rights. Cutrer testified that, during the conversation, defendant denied that he knew anyone named “Robert Burns” and that he had sold any horses.
Defendant took the stand in his own defense and testified that on July 27 he left his home between 12:00-1:00 p.m., driving his truck and empty trailer to Johnny Ogden’s house. He and Ogden went into a barn behind Ogden’s house, caught three horses, put them in his trailer and left for Tylertown. Defendant admitted that he had picked up the check for the sale of the horses following their sale at the auction, but maintained he had done so pursuant to Ogden’s instructions. He testified that Ogden told him the check would be made out to “Robert Burns”. He admitted that he endorsed the check, using the payee’s name and underneath it his own. He further indicated that he gave the money he received from the check to Ogden. Defendant denied that he checked the horses into the auction sale barn and that he had told Harvey Holmes that he wanted to sell the horses under the name “Robert Bums”.
Defense witness Carol Bannister Emilia-ni, who lived with defendant, testified that defendant left their home at about 12:30 p.m. on the day of the auction sale. His trailer was empty at the time, and he was going to Johnny Ogden’s house to haul some of Ogden’s horses to the auction sale. Subsequently, defendant was convicted as charged.
ASSIGNMENT OF ERROR NO. 1:
By means of this assignment, defendant contends that the trial court erred by denying a written motion to withdraw as counsel of record filed by C. Jerome D’Aquilla, his retained counsel, and an alternative oral motion for continuance. He argues that the motion to withdraw as counsel was filed within a reasonable time prior to trial. Hostilities and irreconcilable differences existing between counsel and defendant are alleged as reasons for the proposed withdrawal.
D’Aquilla filed the motion to withdraw with the district court on May 5, 1986, exactly one week before trial on the following May 12. On the morning of defendant’s trial, prior to commencement of the trial and in chambers, the trial court conducted a hearing on the motion. Mr. *903 D’Aquilla and defendant testified at the hearing.
The indictment charging the instant offense was filed on August 1, 1985. Mr. D’Aquilla testified at the hearing that he was initially contacted by defendant on the following August 20 concerning his representing defendant in regard to the charge. Mr. D’Aquilla testified that on August 20 he had an interview with defendant, at which time he “went into depth” with defendant regarding the charged offense. Mr. D’Aquilla told defendant he would need to talk to the witnesses defendant identified. He and defendant initially talked about bringing the witnesses to his office in New Roads; but, instead, they decided that counsel would interview the witnesses after defendant’s arraignment on September 12, 1985. Mr. D’Aquilla testified defendant informed him at the arraignment that he could not get his witnesses together at that time but would make arrangements to bring them to counsel’s office. Thereafter, Mr. D’Aquilla did not hear from defendant. On October 29,1985, Mr. D’Aquilla wrote a certified letter to defendant, advising him that counsel needed to talk to him and reminding him that trial was scheduled for November 14, 1985. Mr. D’Aquilla testified that he had a return receipt for the certified letter in his defense file. After receiving the letter, defendant failed to respond. Mr. D’Aquilla filed a motion for continuance of the November 14 trial on the basis of difficulty in obtaining an expert witness. After the continuance was granted, Mr. D’Aquilla telephoned defendant, informed him of the postponement of the trial, and discussed defendant’s bringing his witnesses to counsel’s office. He wrote another certified letter to defendant which was returned unclaimed. Mr. D’Aquilla also wrote a letter to defendant’s sister, Mrs. Brister, who lives in the New Roads area. Mrs. Brister had assisted defendant in initiating contact with counsel. In the letter to Mrs. Brister, counsel related the lack of success he had experienced in his efforts to contact defendant.
Mr. D’Aquilla indicated that on March 25, 1986, he received notice from the trial court to appear on April 7, 1986, for a pre-trial conference in this case. At the conference, counsel explained to the court his difficulty in securing contact with defendant. At that time, the trial court suggested the possibility that counsel issue a subpoena for defendant. Mr. D’Aquilla then caused a subpoena to be issued for defendant for April 16, 1986. Defendant met with him and told him he would meet with counsel again on the following Monday. Mr. D’Aquilla testified that subsequently he received a telephone call from defendant or a member of his family informing him that defendant had been arrested, apparently on the basis of a mistaken belief that defendant had failed to appear in response to the subpoena. The misunderstanding was resolved, and defendant was released from jail. Thereafter, Mr. D’Aquilla received a telephone call from defendant informing him he felt Mr. D’Aquilla was the cause of his being arrested and that he no longer wanted to be represented by him. Mr. D’Aquilla telephoned defendant on May 1, 1986, to inform defendant that he had spoken to the trial court, which had informed him that withdrawal as attorney of record would mean the case would not go to trial on the scheduled trial date, the following May 12. He further informed defendant that the trial court would not be inclined to allow counsel to withdraw and that defendant needed to talk to another attorney about enrolling as counsel of record. Thereafter, Mr. D’Aquilla did not hear from defendant and filed the motion to withdraw as counsel.
Defendant testified at the hearing on the motion to withdraw that he felt he would not get a fair trial and that he could not get his witnesses to counsel’s office before the trial. Defendant, however, testified explicitly that he was not faulting Mr. D’Aquilla for not seeing the defense witnesses. Defendant further stated that he did not give Mr. D’Aquilla the names of the witnesses because he first wanted to make sure the witnesses would testify in his favor. Defendant, however, indicated that his witnesses had agreed, during the previ *904 ous week, to testify on his behalf and that the witnesses were present for the trial.
Defendant further indicated that his dissatisfaction with Mr. D’Aquilla was only in reference to Mr. D’Aquilla’s having caused the issuance of the subpoena which resulted in his arrest. He felt the issuance of the subpoena was unnecessary. He expressly stated that he felt Mr. D’Aquilla was a good attorney and that he had hired him based upon recommendations that he is a good defense attorney.
During his testimony at the hearing on the motion to withdraw, defendant alluded to his having contacted the court, a few days earlier, in regard to relieving Mr. D’Aquilla as counsel of record. Thereupon, the following exchange occurred between defendant and the trial court:
BY THE COURT: Friday morning, May 9?
A Yes sir and anyway you told me I would have to go with Mr. D’Aquilla. BY THE COURT: No sir. I told you I was not going to relieve him.
A You told me I could not change lawyers at this late date and told me I could represent myself. I am too ignorant to represent myself.
BY THE COURT: Let me ask you a question. You told me you had hired Mr. Brown but he could not come today?
A He could not. He is on a murder case and he could not be here today. If you would give me enough time where I can have him look into my case.
BY THE COURT: Mr. Brown has never enrolled and never filed a motion to enroll nor has he contacted the court?
A He will if you give me enough time. There is no way he can come here and represent me. He knows nothing about the case. If I paid him $10,000, there is no way he could represent me this morning.
In denying the motion to withdraw and the alternative motion for continuance, the trial court concluded that defendant had retained counsel for an extended period of time and that a previously scheduled trial had been continued at the request of defendant to secure an expert witness. The trial court further noted that defendant had placed himself in the position of not having furnished Mr. D’Aquilla with his witnesses and defendant could not further postpone the trial by virtue of his own laches.
While a defendant’s right to the counsel of his choice is firmly established in our law, that right may not be used to obstruct the orderly procedure of the courts nor to interfere with the fair administration of justice. State v. Johnson, 389 So.2d 1302 (La.1980); State v. Sensley, 460 So.2d 692 (La.App. 1st Cir.1984), writ denied, 464 So.2d 1374 (La.1985). A criminal defendant must exercise his right to counsel of his choice at a reasonable time, in a reasonable manner and at an appropriate stage of the proceedings. State v. Seiss, 428 So.2d 444 (La.1983); State v. Champion, 412 So .2d 1048 (La.1982).
The record reflects that defendant retained counsel of his own choosing on August 20, 1985, prior to his arraignment. Trial had been previously set for November 14, 1985, on which date defense counsel filed a motion for continuance, which was granted. Thereafter, precisely one week before the rescheduled trial date of May 12, 1986, retained counsel filed the motion to withdraw as counsel. Defendant admitted that he was not displeased with Mr. D’Aquilla at the time of his first scheduled trial. Defendant’s dissatisfaction with defense counsel related only to the matter of his arrest after the issuance of the subpoena. Defendant’s contention that he had hired other counsel after he became displeased with Mr. D’Aquilla was unsubstantiated. The trial court noted that defendant’s alleged newly hired counsel had never filed a motion to enroll nor had he ever contacted the court. Under these circumstances, the attempt by defendant to dismiss Mr. D’Aquilla can be viewed in no other light than as an effort to use his right to counsel of his choice to obstruct the orderly procedure of the trial court and to interfere with the administration of jus *905 tice. Such an attempt cannot be countenanced. Under these circumstances, we do not view defendant’s effort to relieve Mr. D’Aquilla as counsel of record as an exercise of defendant’s right to counsel of his choice at a reasonable time, in a reasonable manner or at an appropriate stage of the proceedings. Furthermore, there is no evidence in the record which would have made it necessary for defendant to change retained counsel shortly before the commencement of the trial. Absent a justifiable basis, there is no constitutional right to make a new choice of counsel on the eve of trial with the attendant necessity of a continuance and its disrupting implications.
This assignment of error is, therefore, without merit.
ASSIGNMENT OF ERROR NO. 2:
By means of this assignment, defendant contends that the state provided inadequate “768” notice concerning alleged inculpatory statements made by him to Johnny Ogden. He argues that the notice did not provide him sufficient specificity of the content of the statements, thus denying him a fair trial by denying him the opportunity to rebut the statements.
During the direct examination of state witness Johnny Ogden, defense counsel objected to the introduction of any evidence regarding any inculpatory statements made by defendant to Ogden on the basis that the notice failed to disclose the substance of the statements. In denying defendant’s objection, the trial court ruled that the state’s “768” notice complied with the provisions of La.C.Cr.P. art. 768 and that the state was not required to disclose the substance of the statements.
The “768” notice furnished to defendant provided, in pertinent part:
The State of Louisiana informs the Defendant that it intends to use the following statements and/or confessions in connection with trial of the above matter:
1) Oral Statements:
******
d) To Johnny Ogden, on various dates between approximately July 14,1985 and July 27, 1985 at various locations in East and West Feliciana Parish and in (sic) route to Tylertown, Mississippi.
Under La.C.Cr.P. art. 768, the state must give sufficient notice of each confession or inculpatory statement it intends to use, with sufficient specificity as to date or occasion and as to persons to whom given as to afford adequate notice sufficient to permit defendant a fair opportunity to meet the issue. State v. Sneed, 316 So.2d 372 (La.1975). We note that Ogden’s testimony regarding statements made by defendant to him apparently pertained only to statements made on July 27, 1985, the date of their trip to Tylertown, Mississippi. Accordingly, we find that the state’s “768” notice, as set forth above, sufficiently complied with the requirements of La.C.Cr.P. art. 768. More particularly, LSA-C.Cr.P. art. 768 does not require the state to disclose the substance of such statements. State v. Mitchell, 437 So.2d 264 (La.1983). See also State v. Quincy, 363 So.2d 647 (La.1978). Hence, the trial court correctly denied defendant’s objection.
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. 6: (Number 3 in brief)
By means of this assignment, defendant contends that the trial court erred by denying his motion for mistrial. He argues that a mistrial should have been granted under La.C.Cr.P. art. 771 because an admonition was insufficient to assure him a fair trial.
At the beginning of his cross-examination of defendant, the prosecutor asked the following question: “Mr. Delatte, you understand by taking the witness stand that anything you say might be used against you?” Defense counsel objected to the question and requested a mistrial on the basis of the impropriety of the prosecutor’s advising defendant, in the presence of the jury, of any constitutional right he might have. The trial court denied the requested mistrial and admonished the jury to disregard the prosecutor’s previous question.
Under La.C.Cr.P. art. 771, it is within the trial court’s sound discretion to grant a *906 mistrial if the court believes that an admonition is insufficient to assure defendant a fair trial. State v. Jones, 451 So.2d 1181 (La.App. 1st Cir.1984). While the prosecutor’s question was improper, the trial court’s admonition to the jury to disregard the question was sufficient to cure any possible prejudice to defendant. Hence, there was no abuse of discretion by the trial court in refusing to grant a mistrial.
This assignment is meritless.
ASSIGNMENT OF ERROR NO. 7: (Number 4 in brief)
By means of this assignment, defendant contends that the trial court erred by denying his motion for mistrial. Defendant argues that, during the prosecutor’s cross-examination of him, the prosecutor referred to his post-arrest silence contrary to Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).
The alleged improper reference to defendant’s post-arrest silence occurred during his cross-examination as follows:
Q Did you tell the Sheriff’s Office that these horses were over at Johnny Ogden’s?
A They never asked me. They never questioned me about nothing. Nobody’s questioned me.
Q No, sir, my question was ...
A No, sir, I didn’t.
Q ... did you tell the Sheriff’s Office
[[Image here]]
A They never asked me.
At this juncture, defense counsel objected to the state’s questioning and the jury was retired from the courtroom. Defense counsel then moved for a mistrial, arguing that the questioning constituted an indirect reference by the prosecutor to defendant’s election to remain silent. The court ruled that defendant was not entitled to a mistrial. The jury was returned to the courtroom. Thereupon, the trial court admonished the jury to disregard any prior statements and responses to the prosecutor’s last question.
In Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, the defendants remained silent after being advised of their Miranda rights. At trial, they gave testimony of an exculpatory version of the events which led to their arrests. In an attempt to impeach the defendant’s exculpatory trial testimony, the prosecutor cross-examined the defendants about their failure to relate their exculpatory versions to the police. In reversing their convictions, the Supreme Court held that the use for impeachment purposes of an accused’s post-arrest silence at the time of arrest and after receiving Miranda warnings violated due process.
Herein, the record reflects that, following defendant’s arrest, he was advised by Deputy Cutrer of his constitutional rights before questioning at the Walthall County Sheriff’s Office. After being so advised, however, defendant relinquished his right to remain silent and submitted to questioning by Cutrer. Cutrer characterized the questioning as a “very limited conversation”. In reference to Cutrer’s questioning of defendant, Cutrer testified that during the questioning the name “Robert Burns” came up and defendant stated he did not know anyone by that name. Cutrer also testified that when he asked defendant about the sale of the horses in Tylertown, defendant stated that he did not sell any horses.
When defendant took the stand in his own defense, on direct examination, he gave his exculpatory version of the events leading to his arrest. He related how he had gone to Johnny Ogden’s house on the day of the auction sale with an empty trailer behind his pickup truck. He testified that he and Ogden went into the barn behind Ogden’s house, caught three horses, loaded them in his trailer and departed for Tylertown. He helped Ogden unload the horses prior to their sale. After the sale of the horses, he picked up the check for the purchase prices of the horses as instructed by Ogden. Thereafter, at Ogden’s request, he cashed the check he had picked up and gave Ogden the money from the check.
During the prosecutor’s cross-examination of defendant, defendant explicitly repudiated the post-arrest statements he had made to Deputy Cutrer. He instead main *907 tained that Cutrer’s only questions and his responses were as follows:
“What do you know about Dr. Issel’s horses?” I said, “The only thing I know is Dr. Issel owns some horses.” He said, “What do you know about them three horses you took from Dr. Issel?” I said, “I did not take them.”
Under the instant facts and circumstances, we do not view the prosecutor’s attempt to impeach defendant, by asking him whether or not he told the sheriffs office that the horses came from Johnny Ogden’s house as reversible error under Doyle. Unlike Doyle, this defendant relinquished his right to remain silent and made statements to Deputy Cutrer. At trial, defendant took the stand, repudiated the statements the deputy attributed to him, and testified as to. having given the deputy different statements. We view the prosecutor’s impeachment attempt as having been for the purpose of demonstrating inconsistencies between defendant’s post-arrest statements and his trial testimony. See State v. Summit, 454 So.2d 1100 (La.1984), writ denied, 470 U.S. 1038, 105 S.Ct. 1411, 84 L.Ed.2d 800 (1985). In any event, we note that, although the trial court denied defendant’s motion for mistrial, it admonished the jury to disregard the question and answer to which this assigned error relates.
This assignment is without merit.
ASSIGNMENTS OF ERROR 9 AND 10: (Number 5 in brief)
By means of these assignments, defendant contends that the trial court erred by denying his motions in arrest of judgment and for new trial. In brief, defendant argues that the verdict is contrary to the law and the evidence because his conviction is based upon an unconstitutional statute. Citing Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1984), defendant argues that La.R.S. 14:67.1 violates his due process rights by virtue of a presumption contained in the statute which eliminates the state’s burden of proving a requisite element of the charged offense, i.e., an actual taking or misappropriation of livestock. Defendant also argues that the verdict is contrary to the law and evidence on the basis of his assigned error number seven (number 4 in brief) which we previously addressed and found to be without merit. Defendant additionally argues that the trial court erred by failing to grant his motion for new trial on the ground of newly discovered material evidence.
CONTENDED UNCONSTITUTIONALITY OF LA.R.S. 14:67.1
La.R.S. 14:67.1 (A) provides as follows: Theft of livestock is the misappropriation or taking of livestock belonging to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of the livestock is essential. It shall not be necessary to prove defendants killed the animal; the mere taking of meat from the animal shall constitute theft hereunder. Transportation of livestock to a slaughterhouse or an auction sale barn and assignment in a record book in a name other than that of the owner shall also be theft of livestock. An intent to deprive the owner permanently of funds derived from sale is essential, [emphasis added]
The language of the statute which defendant argues is unconstitutional consists only of the last two sentences.
The elements of the crime of theft of livestock as set forth in the first two sentences of La.R.S. 14:67.1 are: (1) that there be a misappropriation or taking without consent or by fraud, (2) that the misappropriation or taking be of livestock, (3) that the livestock belong to another, and (4) that the misappropriation or taking be with the intent to deprive the other permanently of the livestock.
Due process requires the prosecutor to prove each element of a crime beyond a reasonable doubt. In re Win-ship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); State v. Lindsey, 491 So.2d 371 (La.1986). Because a taking or *908 misappropriation of livestock is an element of the charged offense, the state must prove this element beyond a reasonable doubt.
An irrebuttable or conclusive presumption is one which relieves the state of its burden of persuasion by entirely removing the presumed element from the case upon the state’s proof of the predicate facts. Francis, 105 S.Ct. at 1971; State v. Jones, 481 So.2d 598 (La.1986). The language of La.R.S. 14:67.1 (A) provides for a mandatory conclusive presumption that the transportation of livestock to a slaughterhouse or an auction sale barn and assignment in a record book in a name other than that of the owner “shall also be theft.” The statute additionally provides that an intent to deprive the owner permanently of funds derived from the sale is essential. To sustain the use of a mandatory presumption to prove a crime or element of a crime, the prosecution must demonstrate that the presumed fact (herein, a misappropriation or taking) must beyond a reasonable doubt flow from the proved fact on which it is made to depend. State v. Lindsey, 491 So.2d 371 (La.1986). The fact of a misappropriation or taking without consent or by fraud flows beyond a reasonable doubt from proof that an accused transported livestock to a slaughterhouse or an auction sale barn and assigned the livestock in a record book in a name other than that of the owner, provided that the accused did so with the intent to permanently deprive the owner of the funds derived from the sale. No other reasonable conclusion can flow from proof of the foregoing scenario. Accordingly, the mandatory presumption contained in the last two sentences of La.R.S. 14:67.1 (A) does not violate defendant’s rights to due process.
SUFFICIENCY OF THE EVIDENCE
The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. State v. Garcia, 483 So.2d 953 (La.1986).
We note that defendant’s assignment of error number ten asserts that the verdict is contrary to the law and the evidence. However, in brief defendant argued that the verdict was contrary to the law and the evidence on only two bases, viz., that La. R.S. 14:67.1 contains an unconstitutional presumption, and that the prosecutor improperly referred to defendant’s post-arrest silence during the state’s cross-examination of defendant. We previously reviewed and found no merit to both of these contentions.
The proper method to raise the issue of insufficient evidence is by motion for post verdict judgment of acquittal pursuant to La.C.Cr.P. art. 821. State v. For-man, 439 So.2d 1099 (La.App. 1st Cir.1983). The record does not indicate defendant made such a motion, but it does contain an assignment of error number ten which alleges the evidence was not sufficient. This Court will review the sufficiency of the evidence, although this issue was neither properly raised nor directly addressed in defendant’s argument in brief. In doing so, we will consider the evidence as though a motion for post verdict judgment of acquittal had been filed under La.C.Cr.P. art. 821.
After viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found beyond a reasonable doubt all the essential elements of theft of livestock. In reaching its verdict, the jury obviously rejected defendant’s version of the events and accepted the version supported by the state’s witnesses and other evidence. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. State v. Mullins, 464 So.2d 459 (La.App. 1st Cir.1985). The evidence of record is sufficient to support the jury’s verdict.
NEWLY DISCOVERED EVIDENCE
The newly discovered evidence which defendant contends entitles him to a new trial *909 is the testimony of Bill Woodard. He asserts that Woodard would testify that, on at least three occasions during the time of the alleged theft of the horses, he saw several horses in Johnny Ogden’s horse pen. On one occasion Ogden asked Woodard if he wanted to purchase one of the horses, and the horse closely resembled one of the stolen horses.
La.C.Cr.P. art. 851 provides in pertinent part that:
The court, on motion of the defendant, shall grant a new trial whenever:
* * * * * *
New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.
In denying defendant’s motion for new trial following a hearing on the motion, the trial court found that defendant lacked due diligence in regard to his claimed newly discovered evidence. The trial court noted the apparent inconsistency between defendant’s assertions advanced on his claim of newly discovered evidence and his assertions in support of his pretrial motions for withdrawal of counsel and continuance. The court noted defendant claimed a lack of communication between himself and defense counsel at the hearing on the pretrial motions, and on the motion for new trial he argued the other side, i.e., that he had been very diligent, helpful and provided names of witnesses. In finding an absence of due diligence on the part of defendant, the trial court noted that defendant's positions on the pretrial motions and in support of the newly discovered evidence claim were irreconcilable. We concur with the trial court’s conclusions that defendant lacked due diligence. Additionally, the claimed newly discovered evidence was cumulative as to an issue fairly disclosed and decided at trial. Hence, the evidence was not new evidence, and it does not serve as a basis for a new trial on the ground of newly discovered evidence. See State v. Lavene, 343 So.2d 185 (La.1977). Defendant himself and defense witness Carol Bannister Emiliani gave testimony at trial substantially similar to the testimony defendant claims Bill Woodard would give.
These assignments of error are without merit.
ASSIGNMENT OF ERROR NO. 11:
By means of this assignment, defendant asserts that his sentence is excessive and the trial court failed to comply with the guidelines of La.C.Cr.P. art. 894.1.
Article I, § 20 of the Louisiana Constitution prohibits the imposition of excessive punishment. Excessiveness of a sentence is a question of law which is reviewable. See State v. Sepulvado, 367 So.2d 762 (La.1979). A sentence may be excessive either by reason of its length or because the circumstances warrant a less onerous sentencing alternative. State v. Telsee, 425 So.2d 1251 (La.1983). Consequently, a sentence may be both within the statutory limits and constitutionally excessive. State v. Sepulvado. A sentence is excessive when it is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. To determine whether a penalty is grossly disproportionate to the crime, the court considers the punishment and the crime in light of the harm to society and whether the penalty is so disproportionate as to shock our sense of justice. State v. Bonanno, 384 So.2d 355 (La.1980). Because of the wide discretion afforded the trial court in imposing sentence, a sentence within statutory limits will not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Abercrumbia, 412 So.2d 1027 (La.1982).
The Code of Criminal Procedure sets forth items which must be considered by the trial judge before passing sentence. La.C.Cr.P. art. 894.1. The trial judge need not recite the entire checklist of article 894.1, but the record must reflect that he adequately considered the guidelines. State v. Davis, 448 So.2d 645 (La.1984).
*910 La.R.S. 14:67.1 provides that theft of livestock is punishable by a maximum fine of five thousand dollars or imprisonment, with or without hard labor, for a maximum of ten years, or both. Defendant was sentenced to a term of eight and one-half years at hard labor and no fine was imposed.
A review of the record in this case reveals that the trial court ordered a presen-tence investigation report. In sentencing defendant, the trial court noted there was an undue risk that during a period of suspended sentence or probation that defendant would commit another crime. The trial court noted that defendant was in need of correctional treatment in a custodial environment that could most effectively be provided by committing defendant to an institution. The trial court opined that previous probation efforts and parole considerations afforded to defendant had been unsuccessful. The trial court noted that the crime of theft of livestock is a serious offense and represented a continuation of breaches of the law by defendant and a lesser sentence would deprecate the seriousness of the offense. Specifically, the trial court noted that defendant’s extensive criminal history included felony convictions for: simple burglary, simple robbery, simple escape, accessory after the fact of simple robbery, and a weapons violation in Florida. Although defendant’s conduct in this case did not involve violence to a person, it caused economic harm and was designed to and did deprive a person and his family of their enjoyment of their property. The trial court concluded that defendant feels no remorse or guilt, and the victim of the theft did not facilitate the commission of the crime. The trial court noted there had been no compensation or contemplated compensation of the victim. The trial court noted also that, while imprisonment would entail hardship to Carol Bannister Emiliani with whom defendant lived, and their two small children, it was necessary in this case.
Our review of the record in this case shows that the trial court more than adequately complied with the sentencing guidelines of La.C.Cr.P. art. 894.1. The trial court carefully individualized the sentence to the offense and defendant, considering mitigating and aggravating factors as they apply to defendant. Given the trial court’s wide discretion to impose a sentence within statutory limits, we find that the sentence imposed is not excessive.
CONVICTION AND SENTENCE AFFIRMED.